**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**KIM CAMPBELL,**

     **Plaintiff,**

**vs.**                            **Case No. 1:13cv109-MP/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's applications for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and Supplemental Security Income (SSI) under Title XVI of the Act.   After careful consideration of the record, it is recommended that the decision of the Commissioner be affirmed.

## I.  Procedural History

On August 23, 2011, Plaintiff, Kim Campbell, filed applications DIB and SSI alleging disability beginning July 1, 2006.[1]   R. 11, 149-64, 204.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   Plaintiff's last date of insured status for DIB is December 31, 2014. R. 13, 234.

Plaintiff's claims were denied initially on November 18, 2011, and on reconsideration on February 14, 2012.   R. 11, 86, 92, 103, 108.   On April 2, 2012, Plaintiff requested a hearing.   R. 11, 114.   On August 17, 2012, the evidentiary, video hearing was held with the ALJ and vocational expert in Jacksonville, Florida, and Plaintiff appeared by video from Gainesville, Florida.   R. 11, 25-43.   Plaintiff appeared pro se and testified.[2]   R. 11, 29-42.   C. Kimball Heartsill testified as an impartial vocational expert.   R. 11, 37-39, 143-46 (Resume).

On September 19, 2012, ALJ William H. Greer entered his decision concluding that Plaintiff is not disabled.   R. 11-19.   On November 23, 2012, Plaintiff sought review of the ALJ's decision with the Appeals Council and submitted additional evidence.

---

[1]   On November 19, 2004, Plaintiff filed applications for DIB and SSI, which were denied initially on March 4, 2005, and then filed applications for DIB and SSI, which were denied initially on July 22, 2008.   R. 11, 204.   Plaintiff did not appeal these decisions. R. 11.   The Administrative Law Judge (ALJ) in this case determined there was good cause for not reopening these prior claims.   *Id.*   As a result, the ALJ determined that Plaintiff's alleged onset date is July 23, 2008, and the relevant period for consideration is from that date through the date of his decision, September 19, 2012.   *Id.*

[2]   The ALJ stated that "[a]lthough informed of his right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative."   R. 11; *see* R. 27-29, 126, 131-32.

R. 6-7, 305-12 (Disability Report, November 17, 2012-Exhibit 21E).   On April 12, 2013,

the Appeals Council denied Plaintiff's request for review.   R. 1-5.   On June 11, 2013,

Plaintiff, by counsel, filed a Complaint and seeks judicial review of the decision.   Doc. 1.

Both parties filed memoranda of law, which have been considered.   Docs. 22 and 23.

## II.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial

evidence is more than a scintilla, but less than a preponderance.   It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual

findings are conclusive if supported by substantial evidence."   Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[3]

"In making an initial determination of disability, the examiner must consider four

---

[3]  "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232,
1240 n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ.   A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence relied
on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).   "Unless the
Secretary has analyzed all evidence and has sufficiently explained the weight he has
given to obviously probative exhibits, to say that his decision is supported by substantial
evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole
to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662
F.2d 731, 735 (11th Cir. 1981) (citations omitted).

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"   Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).[4] Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).   In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.   See 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

---

[4]   The relevant DIB and SSI regulations are virtually identical.   As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise.   The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

§ 404.1520(a)(4)(i)-(v):

1.   Is the individual currently engaged in substantial gainful activity?[5]

2.   Does the individual have any severe impairments?

3.   Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.   Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?

5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden then shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform

---

[5]   *See* 20 C.F.R. § 404.1572.

the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."   Wilson v. Barnhart, 282 F.3d at 1227.   *See also* Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).   The ALJ is not required, however, to include findings in the hypothetical that the ALJ has properly rejected as unsupported.   *See* Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004); McSwain v. Bowen, 814 F.2d 617, 620 n.2 (11th Cir. 1987).

## III.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirements of the Social Security Act through on December 31, 2014."  R. 13.

2. "The claimant has not engaged in substantial gainful activity (SGA) since July 23, 2008, the date of the earlier initial determination."  R. 14.

3. "The claimant has the following severe impairments: bipolar disorder, NOS; intermittent explosive disorder; antisocial personality disorder; and history of DA&A (alcohol, cocaine, and cannabis abuse)."   *Id.*

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   *Id.*

5. "[T]he claimant has the residual functional capacity [RFC] to perform a full range of work at all exertional levels, but with the following non-exertional limitations: simple, unskilled, repetitive routine work with brief/superficial contact with the general public, no crowds; dealing with things not interacting with others."   R. 15.

6.  "The claimant is capable of performing past relevant work as a construction worker II.   This work does not require the performance of work-related activities precluded by the claimant's [RFC]."   R. 18; *see infra* at 15-19.

7.  "The claimant has not been under a disability, as defined in the Social Security Act, from July 23, 2008, through the date of" the ALJ's decision. R. 18.

## IV.   The Medical and Other Evidence

While in county jail in 2002, Plaintiff was diagnosed with bipolar disorder.

R. 333.   On December 8, 2004, following a release from prison, Plaintiff's care provider

at Meridian Behavioral Healthcare, Inc. (Meridian) found him oriented, with a good mood,

fair insight and judgment, and a fair prognosis.   Plaintiff denied hallucinations.   R.

356-58.   Plaintiff was diagnosed with depressive disorder, not otherwise specified

(NOS), and polysubstance abuse in partial remission, and he was assigned a Global

Assessment of Functioning (GAF) score of 70.[6]   R. 358, 442.

---

[6]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."   *See* DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.   See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."   DSM-IV-TR 34.   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   *Id.*   A GAF scale rating of 61 to 70 indicates some mile symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.   *Id.*

Plaintiff was incarcerated again in November 2006 on charges relating to drugs

and felony battery.   R. 242, 333.   In subsequent examinations, Plaintiff exhibited,

among other things, a euthymic mood, intact memory, and a logical and goal-directed

thought process.   R. 334, 336.   For example, on December 14, 2006, the Florida

Department of Corrections (FDOC) performed a medical examination that included the

following comments:

> Inmate reported irritability with difficulty falling asleep (typically sleeping about 3
> hours).   He feels hyper, and sometimes also talks very quickly and says things
> that get him in trouble.   His thoughts tend to jump around and he gets into a lot of
> fights.   He has also gone on shopping sprees.   Inmate admitted to
> self-medicating with cocaine in the past.   Inmate reported being compulsive about
> keeping things in order and following his schedule.   Inmate denied any problems
> with appetite.   Inmate denied suicidal/homicidal ideation, intent, and plan.
>
> Inmate was oriented x 3.   Inmate's mood was euthymic; affect was variable and
> expressive.   No psychotic process was evidence.   Inmate spoke at a normal rate
> and tone.   Thought processes were logical and goal-directed.   Immediate,
> recent, and remote memory appeared to be intact.   Fund of information was
> adequate.   Inmate was able to interpret one common saying, but not a second.
> Inmate performed serial sevens subtraction five places with two errors.   Inmate
> was cooperative and appeared to be reliable informant.

---

The "Commissioner has declined to endorse the GAF scale for 'use in the Social
Security and SSI disability programs,' and has indicated that GAF scores have no 'direct
correlation to the severity requirements of the mental disorders listings.'"   Wind v.
Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746,
50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the Diagnostic and Statistical Manual
of Mental Disorders (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be
dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e.,
including symptoms, suicide risk, and disabilities in its descriptors) and questionable
psychometrics in routine practice.   In order to provide a global measure of disability, the
WHO Disability Assessment Schedule (WHODAS) is included, for further study, in
Section III of DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16; see
Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va.
Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale
was abandoned as a measurement tool.").

R. 334-35.   Plaintiff's "current mental status" was within normal limits except for anxiety.
R. 334.

He was released on parole in June 2008.   R. 346.[7]   In connection with a
court-ordered substance abuse evaluation, Plaintiff denied suicidal and homicidal
ideation, and his care provider at Meridian found his mood frustrated and insight limited,
but his perception, memory, concentration, and problem solving were intact, his judgment
was fair, his thought content was unremarkable, and his thought process was coherent.
R. 347-49.   Plaintiff was diagnosed with cocaine and alcohol dependence (in remission),
and bipolar disorder, NOS, and he was assigned a GAF score of 50 and prognosis
guarded.   R. 349.

Other than a Treatment Plan dated July 28, 2008, outlining Plaintiff's continuing
transition back to the community, the record includes no evidence of medical treatment
prior to June 15, 2010, almost two years after the start of the relevant period.   R. 397,
433.   At that time, Plaintiff's care provider at Meridian opined that he exhibited good
activities of daily living, his manner was appropriate, his motor function and speech were
normal, his mood was good, his affect was congruent, and his insight and judgment were
fair.   R. 434-35.   Plaintiff denied suicidal and homicidal ideation, he was assigned a
GAF score of 55, and he was diagnosed with bipolar disorder, NOS.   R. 435-36.
Plaintiff was prescribed Trazodone and Geodon in connection with his mental
impairments.   R. 436.

---

[7]   A March 17, 2008, FDOC biopsychological assessment, completed by a
psychiatrist and a psychologist, indicated a diagnosis of bipolar disorder, most recent
episode unspecified and a GAF score of 60.   R. 338.

On June 17, 2010, Plaintiff stated that he was dealing with his aggression, and he had been sent home early from work after a disagreement with his supervisor.   Plaintiff reported "severe impulsivity."   R. 391.   Plaintiff admitted some homicidal thoughts, but he denied suicidal ideation, as well as hallucinations and recent hospitalizations.   R. 391. When Plaintiff returned several months later, however, Plaintiff stated that Geodon made him feel better, took the edge off, and he felt less irritable.   R. 429.   Plaintiff reported that he was working at night, sleeping well, and his appetite was good; his care provider at Meridian found his manner appropriate, motor function and speech normal, his mood "OK," his affect congruent, his activities of daily living good, his thought process coherent, and his insight and judgment fair.   R. 429-30.   Plaintiff also denied suicidal or homicidal ideation, and his care provider rated his progress 7 out of 10.   R. 430.

On October 22, 2010, Plaintiff stated that Geodon kept him from stressing out and he was feeling more stable, with no side effects.   R. 427.   Plaintiff's care provider at Meridian opined that his activities of daily living were good, his manner was appropriate, his mood was fair, his affect was congruent, his insight and judgment were fair, his thought process was coherent, and he exhibited no suicidal or homicidal ideation.   R. 428.

Approximately eight months later, in June 2011, Plaintiff was reincarcerated. R. 425.   On June 23, 2011, while Plaintiff was incarcerated, Douglas Froese, LPN, found Plaintiff alert and oriented.   Plaintiff admitted drinking alcohol within the past several weeks, but he denied recent drug use, as well as any history of psychiatric hospitalizations, feelings of hopelessness or helplessness, hallucinations, delusions, or

suicidal ideation.   R. 361.   On the next day, Plaintiff stated that he had not taken his psychiatric medication in a month, and he declined to see a psychiatrist, because he stated that he was to be released in 45 days.   R. 374.

On July 18, 2011, Plaintiff complained of depression, mood instability, agitation, anger, and insomnia, and he did not remember when he had last taken medication. R. 370.   Plaintiff's care provider at the Ocala Community Center found him oriented, and, although Plaintiff reported racing thoughts, his thought process, insight, and judgment were within normal limits, and his current significant stressors were a lack of medication. R. 371-72.   Plaintiff was found at a medium risk of violence, but a low risk of suicide or self-injury.   R. 375.   Plaintiff's care providers at Meridian prescribed Depakote and Trazodone.   R. 368.    He was released from prison on July 30, 2011. R. 425.

On August 3, 2011, Plaintiff reported to his care provider at Meridian that Trazodone was effective to help him sleep.   He also reported no noticeable benefit from Geodon, and having nausea and diarrhea when taking Geodon.   R. 425.   At that time, Plaintiff's care provider found his mood euthymic, his manner appropriate and pleasant, his insight and judgment were fair, and his thought process was relevant and coherent. R. 426.   Plaintiff's care provider opined that his condition was stable on his current medication.   *Id.*   Later that month, Plaintiff returned, and his care provider opined that Plaintiff's activities of daily living were good, his motor behavior and speech were normal, and his insight and judgment were fair, and Plaintiff denied suicidal and homicidal ideation.   R. 424.   Plaintiff's progress was rated 6 to 7 out of 10.   *Id.*   (On January 5, 2012, Meridian reported Plaintiff to be a no show.   R. 444.)

On November 18, 2011, state agency psychological expert John Thibodeau, Ph.D., reviewed the medical record and diagnosed Plaintiff with an affective disorder, as well as a non-severe personality disorder and substance addiction disorder.   R. 46; *see* R. 14, 18 (Exhibit 1A).   Dr. Thibodeau found that Plaintiff had no understanding and memory limitations and *no* sustained concentration and persistence limitations. R. 48.   Plaintiff had social interaction limitations such as moderately limited regarding his ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.   *Id.* Plaintiff was not significantly limited regarding his ability to ask simple questions or request assistance and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.   *Id.*   Dr. Thibodeau explained: Plaintiff "[w]ould have difficulty interacting with the general public due to irritability and distractibility and would also have difficulties accepting supervision."   *Id.* Dr. Thibodeau also found that Plaintiff had adaptation limitations such that he was moderately limited regarding his ability to respond to appropriately to changes in the work setting and ability to set realistic goals or make plans independently of others. R. 48-49.   Plaintiff was not significantly limited regarding his ability to be aware of normal hazards and to take appropriate precautions and his ability to travel in unfamiliar places or use public transportation.   R. 49.   Dr. Thibodeau explained: Plaintiff "[w]ould have difficulties with adapting to changes in the work setting and establishing appropriate/realistic goals due to the interferences by mood instability and antisocial

personality traits on social judgment."   R. 49.   Dr. Thibodeau further explained: Plaintiff

"[a]ppears capable of simple work in low stress environments that did not stress

interpersonal interactions."   *Id.*   Dr. Thibodeau also noted that Plaintiff reported "mental

stability with some mental impairments but overall adequate functionality."

R. 47.   Dr. Thibodeau found that Plaintiff had no past relevant work, noting Plaintiff's

work as a bagboy, cook, and flow personal and no work in 2007.   He did not identify any

laborer (construction) jobs held by Plaintiff from 2006 to 2009.   R. 49-50; *see*

R. 193-94, 196.   The ALJ gave Dr. Thibodeau's opinions "some weight."   R. 18.

On February 10, 2012, William E. Beaty, Ph.D., evaluated Plaintiff.   R. 446;

*see* R. 17 (Exhibit 7F).   Plaintiff's wife drove him to the evaluation; he appeared clean

and dressed appropriately; there were no obvious appearances of being handicapped

and no involuntary movements.   He walked with a normal gait.   *Id.*   Dr. Beaty reported

Plaintiff's history, education, including leaving school in the 11th grade and not

completing a GED, his work and legal problems.   *Id.*   Dr. Beaty also summarized

Plaintiff's substance abuse, medication, and mental health evaluations and treatments.

R. 447-48.   Dr. Beaty reported that Plaintiff's mood was depressed, his affect was

constricted and flat, and his cognitive ability was low average, though Plaintiff was

pleasant, cooperative, his speech was normal, his thought process was intact and

organized, and Plaintiff denied hallucinations and suicidal and homicidal ideation.

R. 448.   Dr. Beaty diagnosed Plaintiff with bipolar disorder, NOS; intermittent explosive

disorder; alcohol abuse in partial remission, cocaine and cannabis abuse, in remission;

and he wanted to rule out attention deficit hyperactivity disorder (ADHD).

R. 449.   Dr. Beaty rated Plaintiff's prognosis as poor, and he assigned Plaintiff a GAF

score of 50.   *Id*.   Dr. Beaty's report also includes a section designated as an

assessment of Plaintiff's ability to do work-related tasks, but this section included

quotations from Plaintiff, in connection with which Dr. Beaty declined to opine further.   *Id*.

(The ALJ provided a brief summary Dr. Beaty's findings.   R. 17.   The ALJ did not refer to

the quoted language under the section labeled "Ability to do work-related Tasks," which

appears to be attributed to Plaintiff.   R. 449.)

On February 13, 2012, state-agency psychological expert Pamela Green, Ph.D.,

independently reviewed the medical record and diagnosed Plaintiff with an affective

disorder, as well as a non-severe personality disorder and substance addiction disorder.

R. 65-72; *see* R. 14, 18 (Exhibit 5A).   Dr. Green opined that Plaintiff had a mild restriction

of activities of daily living; moderate difficulties in maintaining social functioning; and mild

difficulties in maintaining concentration, persistence, and pace, and no episodes of

decompensation.   R. 67.   Dr. Green opined that, overall, Plaintiff retained the RFC such

that he could understand, remember, and complete simple and complex instructions; he

may have difficulty accepting criticism from supervisors and peers, but could cooperate

and be socially appropriate; and he could react and adapt appropriately to low-stress

work environments.   R. 69-70.   Thus, Dr. Green opined, Plaintiff was mentally capable

of independently performing routine tasks on a sustained basis.   R. 70.   Nevertheless,

Dr. Green noted two of Plaintiff's most recent jobs as a bagboy and cook.   R. 70.   Like

Dr. Thibodeau, Dr. Green did not mention Plaintiff's past work as a laborer (construction).

R. 70-71.   She opined that he did not have the RFC to perform past relevant work, which

necessarily included these jobs, and explained: "unskilled work-away from the public."

Dr. Green further opined that Plaintiff was limited to unskilled work because of mental

impairments only.   She concluded that Plaintiff could perform one of three jobs including

farmworker, vegetable; harvest worker; and battery stacker.   R. 71.   The ALJ gave Dr.

Green's opinions "some weight."   R. 18.

## V.   Administrative Hearing: Past Relevant Work and Hypothetical Question

During the administrative hearing, the ALJ asked Plaintiff about his prior work and

referred to Exhibit 5D, which is a certified earnings record.   R. 30-32.   Plaintiff is referred

to several jobs, including fast-food work (performing cleaning and cooking) at McDonald's

in 2011; cooking at Wendy's in 2010; and cooking at Burger King in 2006.   R. 30-31.

Then, the ALJ referred Plaintiff to reported work in 2006, noted as "worker's temporary

staffing."   R. 31, *see* R. 174-75.   Plaintiff described this work as "[l]andscapping, clean

ups, it's mostly – it's a temporary service.   They help you to clean up construction sites

when they get done.   So, you go out and clean up and stuff like that."   R. 31.   The ALJ

stated, "[i]t says landscaping, were you cutting any lawns" and Plaintiff responded, "[n]o.

It was just cleaning up, like laying sod and stuff like that.   You know, you go out and they

already have somebody out there that [is] supervising, and they just tell you what you got

to do."   *Id.*   Relevant here, the ALJ also asked the Plaintiff about the kind of work he did

for Manpower and Plaintiff responded: "Manpower, the same type of work.   When they

had construction jobs, hotels that [sic] remodeling, you go in and re-do those.   You go in

and, like, strip them out, or you go in and move furniture around for them."   Plaintiff does

not argue that his work in construction (labor) from 2006 to 2008 was not past relevant

work and/or not substantial gainful activity or that it should not have classified as

construction worker II.[8]   Doc. 22.   R. 32.

The vocational expert provided a list of Plaintiff's jobs performed within the last 15

years.   R. 38.   The vocational expert stated that these jobs included work as a fast food

cook, clean up jobs around construction, i.e., a construction worker (Dictionary of

Occupational Titles (DOT) Occupational Group Arrangement (4th ed., rev. 1991) number

869.687-*016*, very heavy with a SVP of 2), and furniture deliverer.[9]   R. 38.   The ALJ

asked the vocational expert the following hypothetical:

---

[8]   A "work activity report-employee" completed on September 9, 2011, reports
Plaintiff's jobs and amounts earned in labor from 2006 to 2008.   R. 193-94, 196.   There
is also a work and earning summary for 2006 to 2010.   R. 191; *see* R. 185.   The ALJ
determined that Plaintiff had not engaged in substantial gainful activity since July 23,
2008, but noted that Plaintiff had recorded earnings in 2009 to 2011.   R. 14.   The ALJ
proceeded "through the remainder of the sequential evaluation to establish a finding of
disability."   *Id.*

[9]   DOT number 869.687-*016* does not exist.   *Id.*   DOT number 869.687-*026*
provides an elaborate description for construction worker II (construction) in part as
follows:

> Performs any combination of following tasks, such as erecting, repairing, and
> wrecking buildings and bridges; installing waterworks, locks, and dams; grading
> and maintaining railroad right-of-ways and laying ties and rails; and widening,
> deepening, and improving rivers, canals, and harbors, requiring little or no
> independent judgment: Digs, spreads, and levels dirt and gravel, using pick and
> shovel.   Lifts, carries, and holds building materials, tools, and supplies.   Cleans
> tools, equipment, materials, and work areas.   Mixes, pours, and spreads
> concrete, asphalt, gravel, and other materials, using handtools. Joins, wraps, and
> seals sections of pipe.   Performs variety of routine, nonmachine tasks, such as
> removing forms from set concrete, filling expansion joints with asphalt, placing
> culvert sections in trench, assembling sections of dredge pipeline, removing
> wallpaper, and laying railroad track.   Many of these jobs are not full time; project
> size and organization of work determine whether workers spend their time on one
> job or transfer from task to task as project progresses to completion.   Some
> workers habitually work in one branch of industry, whereas others transfer

I want to assume an individual 38 years old with a work background that has been specified to by the claimant.   I want to assume no physical limitations.   Assume that the individual be limited to the work that was simple, unskilled, and repetitive. The contact with the general public be no more than brief, superficial.   The work be done in a non-crowded environment.   Let's also assume that the work be dealing primarily with things, not interacting with people.   Okay.   Could such an individual do any of the past work of the claimant as it was actually performed?

R. 38-39.   The vocational expert responded: "The only thing that would fit in that is that

construction worker.   The DOT for -- it's not a degree of interacting with co-workers.

There may be some, but brief, superficial. . . .The others, you know, are skilled, and some

un-skilled.   So, that would preclude that."   R. 39.   The ALJ then explained the

hypothetical to Plaintiff and the following discussion ensued.

Reexamination of Claimant by Administrative Law Judge

Q Now Mr. Campbell, the vocational expert's basically done two things for me. One, he's described your past work using standard terminology that we use, and then based on a hypothetical, he indicated that such a person would only be able to do one of the past jobs that you've done, the construction worker position. Basically, at this point, if you thought my hypothetical was incorrect about your abilities and limitations, we could change that and see what the response would be from the vocational expert.

A What now?

Q Well, my hypothetical -- this is where I said that while I didn't think the person would have physical limitations, you know, how much he could lift, that sort of thing --

A Okay.

---

according to availability of work or on seasonal basis.   Work is usually performed with other workers.   May be designated according to specific work performed as Air-Hammer Operator (construction); . . . .

*Id.*   The ALJ referred to DOT number 869.687-026.   R. 18.

Q -- I think went along with your testimony.   You didn't really have any physical problems, but you did have some psychological issues.   So, because of that, I limited the work to simple, un-skilled, and repetitive.   Also work that contact with the general public would be no more than brief and superficial.   The work should be done in a non-crowded environment, and I also said that the work should be primarily dealing with things, not interacting with people.   So, based on this hypothetical, the vocational expert said that he thought such an individual could do the construction work [INAUDIBLE] job that you had done before.   Okay?   But if you think what I said in the hypo is incorrect, we could change it, and we'll see what his response would be.

A Well, the only thing I could say is, I don't, you know, I don't interact, really, I don't interact with people.   You know, talk to people. You know, I stay to myself. You know don't, even when I -- any place that I ever work, I always did stuff by myself. I'm probably one or two people that say, "Hey, this need to be done."   But most of the time it's, I'm doing it by myself.   I rather do work by myself, you know, I don't know what they say about the construction part, all I know is, when you're working for a temporary service, they usually have you there for a clean up.   They get you a broom, they tell you, "Hey, we need this pile pick up."   "We need these bricks put over here."   And that's basically about it.   You know, it's temporary work.   And you work that day, and then usually if I don't like it, the way I'm around a lot of people, I change the job.   I won't even go back to that job site.   You know most of the time --

Q Is it --

A -- most of the time they'll put us --

Q [INAUDIBLE]

A -- I'm sorry.

Q No, go ahead.

A Most of the time, they'll put us, like, the temporary service, they'll put us jobs that we can do, at least try to do.   You know, that they know that, I'm not around a lot of people, they'll put me at a job that I'm not around a lot of people.   So, I don't know what he was saying.

Q Well, let me ask this, do you think you could do that kind of work again if they assigned you to the sites where there's not that many people?

A The thing is, it's hard to get a job a [sic] Manpower again because now they're doing background checks and I've been to prison three times.   So, It's hard to get,

you know, It's hard to get a job anywhere.   I have a carrying concealed weapon by a convicted felon.   I have a [sic] aggravated batteries.   You know, I've got all types of charges that keep me from getting certain jobs.   You know, I can't even work at Taco Bell, and that's the simplest job that you can get in this world.   If I could get a job, I would.   You know, everything that I try, if it 'aint about me being around a lot of people, it's about my background.   And I have a terrible background, and you know, or it's about my attitude that keep me from getting a job.   You know, I can't do a lot of people.   So, I don't know what to say.   So, you know.

Q Well, anyway I'll consider what you said.   Thank you for in [sic] today. Have a good --

(The hearing concluded at 4:03 p.m. on August 17, 2012.)

R. 39-41.

## VI.   Legal Analysis

### A.   The Issues

Plaintiff argues that the hypothetical question posed by the ALJ to the vocational expert was incomplete because it did not account for Plaintiff's mental limitations arising out of his severe impairments given his inability to maintain employment in the past, his history of violence, and his resultant multiple incarcerations since childhood. Doc. 22 at 1, 7-18.   Plaintiff disagrees with the conclusion reached by the ALJ regarding whether Plaintiff can perform the job as a construction worker II as described by the vocational expert and found by the ALJ given the alleged deficient hypothetical question posed to the vocational expert, which, according to Plaintiff, omitted critical impairment factors.

Plaintiff does not disagree with the factual findings derived from the medical and other evidence submitted to the ALJ during the evidentiary hearing.   *See* Doc. 22.   In his memorandum, Plaintiff refers to one page of a December 14, 2006, medical examination

report completed by the FDOC "which showed the following: Inmate reported irritability

with difficulty falling asleep (typically sleeping about 3 hours).   He feels hyper, and

sometimes also talks very quickly and says things that get him in trouble.   His thoughts

tend to jump around and he gets into a lot of fights.   (Doc. 8-7, page 334) [R. 334]."   Doc.

22 at 5.   Plaintiff refers to a February 11, 2012, evaluation performed by William E.

Beaty, Ph.D.   Doc. 22 at 5-7; R. 446-49.   Plaintiff also refers to a portion of the

vocational expert's testimony when he is asked a hypothetical question.   Doc. 22 at 8-9;

R. 38-39.

### B.   Substantial Evidence Supports the ALJ's Hypothetical Question Posed to the Vocational Expert

The ALJ recognized that Plaintiff exhibited several severe limitations that

affected his ability to perform basic work activities.   R. 14; *see* 20 C.F.R. § 1520(c).

The ALJ discussed the relevant evidence including the objective medical evidence,

Plaintiff's reported daily and social activities during the application process, and

Plaintiff's hearing testimony.   R. 14-18.   The ALJ determined this evidence did not

demonstrate Plaintiff's condition precluded him from working.   *Id.*   Substantial

evidence supports this conclusion.

Consistent with this evidence, the ALJ accounted for Plaintiff's moderate

limitations in social functioning and regarding his concentration, persistence, or pace by

including in his hypothetical question to the vocational expert that the individual

(Plaintiff) be limited to the work that was simple, unskilled, and repetitive; no more than

brief and superficial contact with the general public; the work be done in a non-crowded

environment; and the work be dealing primarily with things, not interacting with people.

R. 15, 38-39.

The chronology of the relevant medical evidence appears above and no useful purpose is served restating it here.   *See supra* at 7-15.   Plaintiff's care providers' clinical findings support the ALJ's findings.   *Id.*   Although Dr. Beaty indicated Plaintiff's prognosis was poor, he did not opine that his diagnoses of Plaintiff's mental status precluded Plaintiff from working in any reasonable capacity.   In other words, Dr. Beaty did not opine as to Plaintiff's actual degree of functioning.   Rather, Dr. Beaty quoted from what appears to be Plaintiff's characterizations of his limitations and ability to do work-related tasks.   R. 449.   The ALJ appropriately concluded that the record contained no medical evidence regarding work restrictions.[10]

Also, Plaintiff succinctly explained his work-related problems to the ALJ. R. 40-42.   He stated that it was hard to get a job because of the nature and extent his prior criminal record *and* because he has difficulty "being around a lot of people"; he "can't do a lot of people."[11]   R. 42.   Plaintiff's difficulties with other people, particularly at the workplace is documented.   *See, e.g.*, R. 39-41, 48, 334-35, 449.   Yet, none of the medical evidence or the opinions of non-examining psychologists, Drs. Thibodeau and Green, examining psychologist, Dr. Beaty, or Plaintiff's care providers at Meridian or Ocala Community Center or health care providers under the FDOC, demonstrate that Plaintiff cannot work within the limitations posed by the ALJ.

---

[10]   The overall opinions of Drs. Thibodeau and Green support the ALJ's determination that Plaintiff is not disabled.   R. 46-49, 67-70.

[11]   Plaintiff's criminal record is not a basis on which to find him disabled. 20 C.F.R. § 404.1566(c)(7) ("You would not actually be hired to do work you could otherwise do" is not a basis for disability).

Plaintiff argues that the ALJ erred in not giving great weight to Plaintiff's GAF score of 50 assigned by Dr. Beaty.   Doc. 22 at 17.   As noted herein, *see supra* at note 6, a GAF score reflects an individual's functioning at a specific moment.   It is not significantly helpful in determining whether an impairment, here mental, is disabling. *Id.*   In addition to Dr. Beaty's assigned GAF score, Plaintiff had several other GAF scores: 70 in 2004, R. 358, 442; 60 in March 2008, R. 338; and 50 in June 2008, R. 349.

Finally, the vocational expert is a specialist in employment and vocational factors influencing employment.   *See* Phillips, 357 F.3d at 1240.   The hypothetical question posed to Mr. Heartsill was consistent with the ALJ's findings based on the medical and other evidence of record, and the ALJ's credibility findings.   *See* Smith v. Comm'r of Soc. Sec., 486 F. App'x 874, 876 (11th Cir. 2012) (unpublished).   Plaintiff has not demonstrated the ALJ erred in posing the hypothetical question to Mr. Heartsill.   Further, the ALJ did not err in determining that Plaintiff retained the ability to perform prior work as a construction worker II and was, therefore, not under a disability as defined in the Social Security Act.   The ALJ's decision is supported by substantial evidence and he appropriately applied controlling law.

**VII.   Conclusion**

Considering the record as a whole, the findings of the ALJ are based upon

substantial evidence in the record and the ALJ correctly followed the law.    Accordingly,

it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's

applications for Social Security benefits should be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on March 7, 2014.

s/   Charles A. Stampelos
**CHARLES A. STAMPELOS
UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and
recommendations within 14 days after being served with a copy of this report and
recommendation.    A party may respond to another party's objections within 14
days after being served with a copy thereof.    Failure to file specific objections
limits the scope of review of proposed factual findings and recommendations.**